MICHAEL W. YOUNG, USB #12282
LAUREN M. HUNT, USB # 14682
PARSONS BEHLE & LATIMER
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone:  801.532.1234
Facsimile:  801.536.6111
MYoung@parsonsbehle.com
LHunt@parsonsbehle.com
ecf@parsonsbehle.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| PATRICK MADDOX,<br><br>        Plaintiff,<br><br>vs.<br><br>UTAH STATE UNIVERSITY, BLAKE ANDERSON, and JOHN AND JANE DOES 1-10<br><br>        Defendant. | **COMPLAINT AND JURY DEMAND**<br><br>Case No. 1:22-cv-00146-CMR<br><br><br>Judge:  Cecilia M. Romero |

COMES NOW Plaintiff Patrick Maddox, by and through PARSONS BEHLE & LATIMER, and undersigned counsel, and hereby complains against the above-named Defendant as follows:

### PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Patrick Maddox was at all relevant times a resident of the State of Utah.

2.      USU is an institution of higher education located in Logan, Utah.

3.     Defendant Blake Anderson was the head football coach at USU beginning December 20, 2020 and continuing for the remaining relevant time period.

4.     At all relevant times, USU received Federal financial assistance and was therefore subject to the requirements of Title IX of the Education Amendments of 1971, 20 U.S.C § 1681 et seq. ("Title IX").

5.     Plaintiff alleges claims against USU under Title IX and 42 U.S.C. § 1983. Jurisdiction is therefore appropriate in this Court pursuant to 28 U.S.C. § 1331.

6.     Defendants reside in the state of Utah, and the events or omissions giving rise to Plaintiff's claims occurred in the state of Utah. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

### Legal Requirements Under Title IX

7.     An institution may be liable for civil penalties if it has not upheld its legal obligations under Title IX.

8.     It is a violation of Title IX for an institution to engage in retaliation.

9.     A plaintiff establishes retaliation under Title IX by showing "(1) protected activity by the plaintiff; (2) knowledge by the defendant of the protected activity; (3) adverse school-related action; and (4) a causal connection between the protected activity and the adverse action."[1]

---

[1] *Papelino*, 633 F.3d 81, 92 (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998)).

10. Retaliation claims under Title IX extend to those who oppose discrimination against others, which is a "protected activity."[2]

11. Demonstrating a causal connection between the protected activity and the adverse action is a question of fact, which applies the McDonnell Douglas burden-shifting framework.[3]

12. First, the plaintiff must establish a prima facie case of discrimination. Once the plaintiff has established a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions.[4]

13. If the defendant is able to do so, the burden shifts back to the plaintiff to show that the defendant's articulated reasons were pretextual.[5]

14. "The burden on a plaintiff to show a prima facie case of retaliation is low. Only 'a minimal threshold showing of retaliation is required.'"[6] Indeed, "Close temporal proximity between the plaintiff's protected activity and the . . . adverse action may in itself be sufficient to establish the requisite causal connection."[7]

15. The proof necessary for a prima facie case "does not even need to rise to the level of a preponderance of the evidence."[8]

### 1983 Liability Requirements

---

[2] *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237, 90 S. Ct. 400, 24 L. Ed. 2d 386 (1969), *abrogated on other grounds*, *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1855, 198 L. Ed. 2d 290 (2017)).
[3] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).
[4] *Id.*
[5] *Id.*
[6] *Ollier*, 768 F.3d at 867 (quoting *Emeldi v. Univ. of Oregon*, 698 F.3d 715, 724 (9th Cir. 2012)).
[7] *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).
[8] *Emeldi*, 698 F.3d at 724 (quoting *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008)).

16.     To prove a § 1983 claim, a plaintiff must show (1) that a violation of rights secured by the Constitution or laws of the United States; and (2) the alleged deprivation was committed by a person acting under color of law.[9]

17.     "First Amendment [c]laims of retaliation for the exercise of First Amendment rights are cognizable under 42 U.S.C. § 1983."[10]

18.     In order to establish a First Amendment retaliation claim, the plaintiff "must show that [the plaintiff's] conduct was constitutionally protected, and that [the plaintiff's] conduct was a 'substantial factor' or a 'motivating factor' for the defendants' retaliatory conduct."[11]

19.     Video recording is protected speech under the First Amendment.[12]

20.     A retaliation claim can be established through indirect evidence by proving a chronology of events from which retaliation can be inferred.[13]

**Utah Constitutional Violation Requirements**

---

[9] *West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988).

[10] *Rectrix Aerodome Centers, Inc. v. Barnstable Municipal Airport Commission*, 632 F.Supp.2d 120, 131 (D.Mass. 2009); *accord Powell v. Alexander*, 391 F.3d 1, 16 (1st Cir. 2004) ("[c]laims of retaliation for the exercise of First Amendment rights are cognizable under § 1983"); *see also Hartman v. Moore*, 547 U.S. 250, 256, 126 S. Ct. 1695, 164 L. Ed. 2d 441 (2006) ("[o]fficial reprisal for protected speech 'offends the Constitution because it threatens to inhibit exercise of the protected right'").

[11] *Rectrix Aerodome Centers, Inc. v. Barnstable Municipal Airport Commission*, 632 F.Supp.2d at 131 (internal brackets and ellipses omitted).

[12] *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1203-04 (9th Cir. 2018) (finding the creation of an audiovisual recording to be speech because "[t]he act of recording is itself an inherently expressive activity"), or conduct essentially preparatory to speech, *ACLU v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) (emphasis in original) ("The act of making an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech . . . as a corollary of the right to disseminate the resulting recording."); *see also Animal Legal Def. Fund v. Herbert*, 263 F.Supp.3d 1193, 1198 (D. Utah 2017) (examining cases and noting that "it appears the consensus among courts is that the act of recording is protectable First Amendment speech.").

[13] *See Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987).

4

21.     Utah courts recognize that the common law historically permitted individuals to collect damages for constitutional violations.[14]

22.     The Utah Supreme Court has required a plaintiff to establish that (1) he suffered a flagrant violation of his constitutional rights, (2) existing remedies do not redress his injuries, and (3) equitable relief, such as an injunction, is wholly inadequate to protect the plaintiff's rights.[15]

23.     Although the Utah Governmental Immunity Act ("UGIA") expressly retains immunity in cases involving "assault, battery, false imprisonment, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, infliction of mental anguish, or violation of civil rights," Utah courts have held that UGIA "does not apply to claims alleging state constitutional violations."[16] [17]

### USU's Culture of Protecting its Football Team

24.     Statistics show that male college athletes are more likely than the average male college student to commit sexual assaults.[18]

25.     According to one study, male athletes commit one-third of all sexual assaults on college campuses.[19]

---

[14] *See Spackman v. Bd. of Educ.*, 16 P.3d 533, 538 (Utah 2000).

[15] *Id.* at 538–39.

[16] Utah Code Ann. §§ 63g-7-201(4)(b)

[17] *Jensen v. Cunningham*, 250 P.3d 465, 479 (Utah 2011); *see also Bott v. DeLand*, 922 P.2d 732, 736 (Utah 1996) ("[G]overnmental immunity cannot apply where a claimant alleges that the state or a state employee violated his constitutional rights."), overruled on other grounds by *Spackman*, 16 P.3d 533

[18] Jenni E. Spies, *Winning at All Costs: An Analysis of a University's Potential Liability for Sexual Assaults Committed by Its Student Athletes*, 16 Marq. Sports L. Rev. 429, 430 (2006) (citing Nat'l Coalition Against Violent Athletes, Prevention Programs, http://www.ncava.org/prevention.html (last visited Apr. 17, 2006)).

[19] *Id.*

5

26.     Of those athletes committing these assaults, the majority are either football or basketball players.[20]

27.     In short, male football and basketball players are among the most likely perpetrators of sexual violence and assault against women on college campuses.

28.     In January of 2017, the United States Department of Justice, Civil Rights Division, Educational Opportunities Section and the United States Attorney's Office for the District of Utah (together the "United States") initiated a compliance review into whether USU was properly responding to allegations of sexual harassment, including sexual assault, of students in its education programs and activities.

29.     The DOJ investigation found that it was common for USU to close incident files involving athletes after only "minimal investigation."[21]

30.     There were "several players" accused of multiple incidents of sexual misconduct during the time included in the DOJ investigation, according to the DOJ report.[22]

31.     The DOJ concluded that USU repeatedly mishandled cases of sexual assault on campus, failed to investigate when it knew about misconduct and, as a result, "rendered additional students vulnerable."[23]

---

[20] *Id.* (citing *See, e.g.*, Carol Bohmer & Andrea Parrot, *Sexual Assault on Campus: The Problem and the Solution* 21 (1993). *See also* Thomas N. Sweeney, Comment, *Closing the Campus Gates - Keeping Criminals Away from the University - The Story of Student-Athlete Violence and Avoiding Institutional Liability for the Good of All*, 9 Seton Hall J. Sport L. 226, 230 (1999).

[21] *Supra* note 1, at 9.

[22] *Id.*

[23] U.S. Dept. of Just., Title IX Investigation of Utah State University, DJ 169-77-25, SS:FM:VL:AD, Oct. 2, 2019, at 5.

32.     "Severe sexual harassment, including rapes and other forcible sexual assaults, went unaddressed and students who were subjected to sexual harassment often suffered negative academic, mental health, and social consequences, including withdrawal from their classes or from the University altogether."[24]

33.     The DOJ uncovered "significant" failures in how USU responded to complaints, particularly in the school's treatment of athletes, fraternities, and the music department.[25]

34.     In fact, from 2016 to 2020, at least four USU football players were criminally charged with rape, some having multiple victims and several attacks.

35.     Following that investigation, on October 2, 2019, the United States notified USU that it believed USU had failed to comply with Title IX and other related regulations properly and adequately.

36.     The United States and USU subsequently entered into an agreement dated February 12, 2020 ("Settlement Agreement"), wherein USU agreed to take certain measures in order to bring USU into compliance with Title IX and other related regulations.

37.     Thus, since at least 2017, USU has been on notice of a substantial and significant problem with its football players raping and harassing women, and USU's inadequate response to the same.

38.     USU knows that its football team poses a certain obvious risk.

39.     Despite this, USU has not taken concrete enough steps to stem assault and harassment by football players. In fact, USU athletics coordinates with the campus and local police

---

[24] *Id.* at 2.
[25] *Id.*

departments in order to establish protocol for football players to receive preferential treatment in the wake of criminal allegations.

40.     In fact, a meeting between the USU Chief of Police, Logan Chief of Police, Assistant Chief of Logan Police, and the football team was recorded in August 2021.

41.     Local and USU campus police met with the USU football team in order to discuss sexual assault and harassment allegations, among other topics.

42.     The Chief of Logan Police told the football team that local law enforcement wants the team "to play ball" and that law enforcement will "work with [them]" if they were alleged to have committed a crime.

43.     The Assistant Chief of Logan Police gave every player his personal cell phone number for them to call if they found themselves in criminal or legal trouble, allowing the players to say, "I'm asking for a friend…" and get legal advice from the police.

44.     The Assistant Chief of Logan Police assured the players that the press is not their friend, and law enforcement would not notify the press if any player got in trouble.

45.     The Chief of USU Police told the team that he "will work with [the USU coach]."

46.     The Chief of USU Police told the players if they were caught underage drinking to have the coach call him.

47.     The Chief of USU Police made problematic comments about the "Mormon community" in which USU is located and that Mormon women may tell Church leaders that sex was non-consensual even if it was consensual.

48.     The Chief of USU Police told the team that "we're gonna take care of you no matter what," and the officers "just want [the team] to play good football."

49.     In a separate meeting (also recorded) with the football team in August 2021, the football coach Blake Anderson, USU's Title IX coordinator, and a representative from the USU Sexual Assault and Anti-Violence Information ("SAAVI") office, coach Anderson told the team it "has never been more glamorized to be a victim" and that the football team was a "target to some."

50.     The recordings show that USU trainings of the football team perpetuate rape myths and rape culture by focusing on "false rape accusations" as being the norm, football players having "targets on [their] backs", and that it is somehow glamourous to be a victim of such behavior or get publicity for being a victim of such behavior.

51.     In fact, USU expressly conceded that the training was not consistent with its Title IX obligations.

52.     Further highlighting USU's football team's problematic treatment of rape and sexual assault, before games, the football team would often make "funny videos" wherein players' faces would be photoshopped into other film or YouTube clips.

53.     In late November 2021, a USU football graduate assistant coach, stated to a player, "wouldn't it be funny to make a video about [Kaytriauna's rapist] and how he cheated on his girlfriend and sexually assaulted some girl? Wouldn't that be funny?"

54.     The player to whom the assistant coach said that responded, "no, I don't think that would be funny." The video did not end up getting made.

55.     Indeed, this harmful culture surrounding sexual assault/harassment and USU football players goes far deeper.

56.     Upon information and belief, a member of USU's coaching staff sent child pornography to a football player. When the player reported this conduct, the volunteer football coach was transferred to another University and the incident was seemingly swept under the rug.

**Plaintiff Patrick Maddox**

57.     Patrick Maddox, a former member and captain of the USU football team, is the individual who recorded these meetings.

58.     Patrick's friend Kaytriauna Flint had been raped by a USU football player in 2019.

59.     Kaytriauna Flint reported the rape to both law enforcement and USU's Title IX office.

60.     Kaytriauna Flint filed a lawsuit against USU pursuant to Title IX.

61.     As part of her lawsuit, Kaytriauna Flint alleged that USU has a pattern of treating football players and other athletes with leniency, citing the DOJ investigation.

62.     Patrick, in an effort to speak out against and oppose USU's discrimination against Kaytriauna Flint, as well as oppose USU's problematic and discriminatory culture surrounding its athletes, distributed a copy of the recorded football trainings to members of the media.

63.     The media widely reported on these football meetings and the problematic comments given by law enforcement and coaches during them.

64.     At the time, the USU football team was in Los Angeles for a bowl game.

65.     Patrick saw many players in the football team's group chat stating that they wanted to "beat up" whomever had recorded the meetings.

66.     Players stated in the chat that their team meetings were their "sanctuary," and if anyone had a problem with the head coach, they should leave the team.

67.     It became common knowledge amongst the football team that Patrick had recorded the meetings.

68.     During that time, Coach Anderson had to go address the press about these incidents. During the team's morning meeting, Coach Anderson told the team he "had to go address some bullshit real quick."

69.     Patrick was confronted by another teammate who told him that Coach Anderson "felt backstabbed and completely betrayed to the whole team" by Patrick releasing the videos.

70.     Teammates threatened to come to Patrick's home and assault him if he did not apologize to head football coach Blake Anderson.

71.     Patrick arranged a meeting with Anderson to attempt to "clear the air."

72.     Patrick started the meeting by trying to tell Anderson about his friend Kaytriauna who was raped by a fellow teammate.

73.     Anderson cut him off, stating that the recordings of the team meetings had taken Anderson out of context and misinterpreted him.

74.     Anderson stated that while false rape accusations are rare, they do happen.

75.     Anderson stated that what he said about it being "glamorized to be a victim" was true, but he wished he used the word "publicized" instead of "glamorized."

76.     Anderson stated that he wasn't just referring to sexual assault, but rather anything that makes its way to the media.

77.     Anderson told Patrick that he had told other players to "handle [Patrick] however [they] saw fit." Through this statement Anderson impliedly sanctioned physical violence against Patrick.

78.    Anderson stated to Patrick, "you do realize that [releasing the videos] severely harmed my reputation as a Christian, right?"

79.    Anderson told Patrick that he was disappointed in him for making and distributing the recording but forgave him.

80.    However, Anderson asked Patrick if he still wished to remain on the team and even if Kaytri actually supported him staying on the team.

81.    Anderson encouraged Patrick to address the entire team and apologize because otherwise "it would get incredibly uncomfortable for [Patrick] in the locker room."

82.    Anderson told Patrick that other teammates may try "to get answers out of" him.

83.    Again, this statement implied that Anderson sanctioned other players taking violent measures against Patrick.

84.    At no time did Anderson say that he would prevent or take any steps to prevent other players taking violent measures against Patrick.

85.    Two days later, Patrick addressed the whole football team out of fear for his safety.

86.    The environment was very hostile during this meeting.

87.    During this meeting, Anderson told the team that "Patrick had made a mistake" and that "Patrick had owned up to his mistake."

88.    Over the next few weeks, the team and coaches began to ignore Patrick, which was not consistent with their past behavior toward him and was a hostile environment.

89.    Kaytri's assailant had been placed in charge of managing the team's Instagram account, while Patrick was threatened with physical assault for attempting to advocate against discrimination and the team's harmful culture around sexual assault.

90.     The hostile environment continued without Anderson or any of the coaches taking any steps to eliminate the said hostility.

91.     Patrick spoke with Coach Anderson, who told Patrick that "well you betrayed the locker room, son, you gotta earn their trust back and some of those guys will never trust you again."

92.     Patrick spoke with his position coach about potentially leaving the team due to the hostile environment.

93.     The position coach told Patrick he had "betrayed the team" and that he had "lost all trust" in Patrick.

94.     The position coach told Patrick that they should have given him a scholarship the previous fall, but now that he had jeopardized the coaching staff's jobs, the coaches, including Coach Anderson, felt differently.

95.     The position coach made very clear that Patrick would not be getting any future scholarships due to his making and releasing the videos.

96.     It was made clear to Patrick at this and other meetings that he was not welcome on the team, that hostility against Patrick would continue, and that environment on the team would remain intolerable.

97.     The position coach stated, "you know what you did could have cost 20+ families their jobs, right?"

98.     Following this meeting, Patrick went to his football locker the next morning to gather some of his belongings.

99.     Patrick found all his cleats had been stolen and the rest of his belongings had been doused in protein shakes.

4855-3328-9262.v1

100.    Patrick reported this to Dave Roberson, the USU director of player personnel, and received no reply.

101.    USU football administration, including Coach Anderson, made clear to Patrick that the unusually hostile environment on the team would continue indefinitely and that such environment was fostered by the coaching staff in an effort to force Patrick to quit the team.

102.    Patrick officially left the team due to the retaliation taken by fellow teammates and coaches against him, and the hostile environment they created for him, for making and distributing the recordings of the football meetings.

103.    The reaction of the football team and coaches following the leaked recordings emphasizes the toxic nature that exists in USU athletics, and USU's continuing deliberate indifference to a known and obvious risk of sexual assault.

104.    Indeed, while Patrick was retaliated against and bullied into leaving the football team by speaking out against rape culture and discrimination, Kaytriauna's rapist remains a member of the team.

105.    The retaliation against Patrick demonstrates that USU and its athletics are not aiming to fix the problematic culture surrounding USU athletes, but to cover it up.

## FIRST CAUSE OF ACTION

### Retaliation Under Title IX—against USU

106.    Plaintiff incorporates and realleges the allegations of each of the preceding paragraphs as if fully set forth herein.

107.    Plaintiff engaged in a protected activity under Title IX when he opposed USU's discrimination against Kaytriauna Flint and other female students by making and distributing

14

recordings of trainings given to the football team that highlighted the problematic manner in which USU handles conversations about sexual harassment and assault.

108.   USU and its football administration was aware that Plaintiff had engaged in this protected activity of making and distributing these recordings.

109.   Despite this knowledge, USU and its football administration took adverse action against Plaintiff.

110.   USU and its football administration created and promoted a hostile and unsafe environment for Plaintiff in the aftermath of the media reporting on the recordings.

111.   USU and its football administration communicated to Plaintiff that he was in physical danger if he did not apologize for engaging in this protected activity.

112.   USU and its football administration told Plaintiff directly that they were reconsidering his eligibility for a scholarship based on him having engaged in a protected activity.

113.   USU and its football administration communicated to Plaintiff that his behavior had risked the jobs of 20+ people. In reality, those individuals risked their own jobs by engaging in discriminatory and problematic behavior.

114.   As a result of USU and its football administration's retaliation against him, Plaintiff left the football team.

115.   Plaintiff has been proximately and directly harmed as a result of Defendant's actions and has specific damages as a result of USU's retaliation against him, including but not limited to mental and emotional distress, medical expenses, damage to reputation, and lost professional and educational opportunities and benefits.

4855-3328-9262.v1

## SECOND CAUSE OF ACTION

**Retaliation Under § 1983—against Blake Anderson and John and Jane Does 1-10**

116.    Plaintiff incorporates and realleges the allegations of each preceding paragraph as if fully set forth herein.

117.    Plaintiff had a clearly established constitutional right under the First Amendment to make and distribute the recordings of the football team meetings.

118.    USU and its football administration (head coach Blake Anderson, and John and Jane Does 1-10), acting under color of law in their official capacities, violated Plaintiff's constitutional right to free speech.[26]

119.    USU's football administration (head coach Blake Anderson, and John and Jane Does 1-10) carry state authority as public employees and misused that authority in order to carry out their retaliation against Plaintiff, acting as his coaches and other public employees.[27]

120.    USU and its football administration (head coach Blake Anderson, and John and Jane Does 1-10) facilitated and encouraged a hostile environment for Plaintiff in the aftermath of the release of the recordings, in retaliation for Plaintiff's constitutionally protected speech.

121.    USU and its football administration (head coach Blake Anderson, and John and Jane Does 1-10) forced Plaintiff to apologize for his constitutionally protected free speech, and told him that due to this speech, he would be ineligible for a scholarship.

---

[26] "In the public-employee context, the Tenth Circuit has directed that 'state employment is generally sufficient to render the defendant a state actor . . . [,]' *Lee v. Univ. of N.M.*, 449 F. Supp. 3d 1071, 1108 (D.N.M. 2020) (internal citations omitted).

[27] *Id.* "[T]here must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant. . ." to establish a state actor under § 1983.

122.     As a result of USU's and its football administrations' (head coach Blake Anderson, and John and Jane Does 1-10) retaliation against Plaintiff and violation of his First Amendment rights, he has suffered severe and ongoing injuries, damages, and losses for which he is entitled to be compensated.

### THIRD CAUSE OF ACTION

**Violation of the Utah Constitution, Article I, Section 1**
**Against All Defendants**

123.     Plaintiff incorporates and realleges the allegations of each preceding paragraph as if fully set forth herein.

124.     Article I, Section 1 of the Utah Constitution provides in relevant part:

*All persons have the inherent and inalienable right to…assemble peaceably, protest against wrongs, and petition for redress of grievances; to communicate freely their thoughts and opinions, being responsible for the abuse of that right.*

125.     Article I, Section 1, of the Utah Constitution is self-executing.[28]

126.      Plaintiff is a citizen of the State of Utah and enjoys the rights recognized by the Utah Constitution.

127.     Under Tenth Circuit precedent, a "complete ban" on expressive speech in a public forum violates the First Amendment.[29]

128.     Plaintiff was engaged in protected speech by recording and disseminating the video recording of the football meeting as a means to highlight and speak against the harmful culture surrounding sexual assault and athletics at USU.

---

[28] *Jensen v. Cunningham*, 2011 UT 17, ¶62
[29] *Verlo v. Martinez*, 820 F.3d 1113, 1135 (10th Cir. 2016)

4855-3328-9262.v1

129.     The Utah Constitution prohibits Defendants from taking retaliatory actions against citizens for engaging in protected speech.

130.     Such retaliatory actions were flagrant violations of Plaintiff's clearly established rights to free speech, of which a reasonable person would have known.

131.     Existing alternative remedies do not redress Plaintiff's injuries.

132.     Additionally, an injunction is wholly inadequate to protect Plaintiff's rights or redress his injuries, as Plaintiff has already been discharged from the football team.

133.     As a result of USU's and its football administrations' (head coach Blake Anderson, and John and Jane Does 1-10) retaliation against Plaintiff and violation of his Utah Constitutional rights, he has suffered severe and ongoing injuries, damages, and losses for which he is entitled to be compensated.

## FOURTH CAUSE OF ACTION

### Breach of Contract—against USU

134.     Plaintiff incorporates and realleges the allegations of each preceding paragraph as if fully set forth herein.

135.     The Student Code describes the relationship between students and a university as "contractual."[30]

136.     The Student Code constitutes an agreement between USU and its students and contains the rights of students to "express personal opinions on campus, to support or oppose causes, to arrange public assemblies, and to hold rallies, demonstrations, and pickets which do not materially and substantially interfere with normal University activities or the rights of others" as

---

[30] *See* Utah State University's Code of Policies and Procedures for Students, Article I.

18

well as "the right to organize and freedom of association" and "the right to publish and the freedom from censorship."[31]

137.    The Student Code also states that "[r]etaliation is prohibited against any individual who has made a complaint, testified, assisted, or participated in any way in an investigation, proceeding, or hearing in regard to [a sexual discrimination or harassment] grievance."[32]

138.    Plaintiff engaged in speech protected both by the United States Constitution and USU's student code by creating and disseminating a video that supported the cause of Kaytriauna Flint's Title IX investigation, exposed USU's problematic training of athletes regarding sexual assault and consent, effectively expressed Plaintiff's opinion against USU's leniency with athletes surrounding sexual assault and was Plaintiff participating in a proceeding regarding Kaytriauna Flint's Title IX grievance.

139.    USU breached those provisions by retaliating against, effectively attempting to censor, and creating a hostile environment for Plaintiff after he engaged in protected speech that led to Plaintiff leaving the football team.

140.    As a result of this breach, Plaintiff suffered harm including emotional injury, pain and suffering, and past and future expenses for counseling and therapy, and other special damages known and unknown to Plaintiff at this time.

---

[31] *See* Utah State University's Code of Policies and Procedures for Students, Article I, Section II-2.

[32] *Id.* at Section VII-3(B).

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for judgment against Defendant as follows:

1.      For judgment in Plaintiff's favor and against Defendant USU for USU's retaliation as prohibited by Title IX;

2.      For judgment in Plaintiff's favor and against Defendants Blake Anderson, and John and Jane Does 1-10 for USU's retaliation and violation of his First Amendment rights as prohibited by § 1983 and the Utah Constitution.

3.      For judgment in Plaintiff's favor and against Defendant USU for breach of contract.

4.      For an award of compensatory damages in favor of Plaintiff and against Defendant USU, in an amount to be determined at trial;

5.      For an award of special damages in favor of Plaintiff and against Defendant USU for expenses arising out of USU's violations of Title IX, § 1983, and the Utah Constitution, including but not limited to medical and therapy expenses and lost professional and educational opportunities;

6.      For an award of reasonable attorneys' fees and costs associated with this action;

7.      For an award of post-judgment interest as allowed by law;

8.      For such other and further relief as the Court may deem just.

4855-3328-9262.v1

**JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action.

DATED this 27th day of October, 2022.

/s/ Michael W. Young
MICHAEL W. YOUNG
LAUREN M. HUNT
PARSONS BEHLE & LATIMER

*Attorneys for Plaintiff*

21